1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LMC VINEYARDS, LLC,

           Plaintiff,

    v.

ALLIED WORLD NATIONAL
ASSURANCE COMPANY,

           Defendant.

Case No.  24-cv-03357-TLT

**ORDER DENYING PLAINTIFF'S
PARTIAL SUMMARY JUDGMENT
MOTION**

Re: Dkt. No. 27

       This case hinges on whether claims of construction defects from homeowners constitute "suits" that an insurance company was therefore obligated to defend.

       Pending before the Court is Plaintiff LMC Vineyard, LLC's ("Plaintiff") partial summary judgment motion.  ECF 27.  The Court heard oral argument on May 6, 2025.

       Having considered the parties' briefs, the parties' oral arguments and presentations, the relevant legal authority, and for the reasons below, the Court **DENIES** Plaintiff's partial summary judgment motion since there remain genuine issues of material fact as to whether a "suit" occurred. All claims therefore remain.

## I.    PROCEDURAL HISTORY

       On June 4, 2024, Plaintiff filed a complaint against Defendant Allied World National Assurance Company ("Allied World") for the following causes of action: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; and (3) declaratory relief.  ECF 1. Allied World answered the complaint on July 11, 2024.  ECF 12.  Plaintiff moved for partial summary judgment on December 4, 2024, asking the Court to find that (1) a "suit" commenced based on the homeowners' construction defect claims, which triggered Allied World's obligations to Plaintiff; and (2) that Allied World breached its obligations to Plaintiff when it denied coverage for those claims.  ECF 27.  The parties also filed a joint statement of undisputed facts.  ECF 27-1.

Allied World filed a timely opposition.  ECF 38.  Plaintiff thereafter filed a reply.  ECF 39.  The Court held a hearing on May 6, 2025.  ECF 51.

## II.    BACKGROUND

### A.    Parties

Plaintiff owned Trilogy Vineyards, a housing development located in Brentwood, California, during the relevant period of September 30, 2011 through September 30, 2016.  ECF 27, Ex. 3, 2; ECF 27, Ex. 16.  Plaintiff was held responsible for construction defect claims made by homeowners during this period.  *See* ECF 27, Ex. 11, 33–34.  American Safety Indemnity Company ("American Safety") had issued the primary insurance policy to Plaintiff, ECF 27, Ex. 2, and Allied World issued the excess insurance policy, ECF 27, Ex. 3 (collectively, the "policies").

### B.    The American Safety Policy

The American Safety policy stated that American Safety "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  ECF 27-2 at 9.  American Safety will also "have the right and duty to defend the insured against any 'suit' seeking those damages" and "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which [the] insurance does not apply."  *Id.*

American Safety's policy provided the definition of a "suit" as: "a civil proceeding in which damages because of 'bodily injury' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."  *Id.* at 23.  American Safety's policy further clarified that a "suit" includes:

> An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

> Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

*Id.*  The American Safety policy also contained a "no voluntary payments" clause: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."  *Id.* at 18.

### C.    The Allied World Policy

Allied World's policy is termed a "following form excess liability insurance policy."  ECF

United States District Court
Northern District of California

27, Ex. 3, 32. This means that Allied World wrote the policy to "follow the warranties, terms, and conditions, exclusions, and limitations" in the American Safety insurance policy (i.e.: to *follow the form* of American Safety's policy). *Id* at 32. The policy explained the role of an "excess insurer:" to "pay, on behalf of the insured, that part of loss, to which this policy applies, *which exceeds* the applicable underlying limits (i.e.: the limits of American Safety's policy)." *Id*. (emphasis added). Stated differently, Allied World is termed an "excess layer insurer" because it only comes in to provide what it is obligated to pay in *excess* of what American Safety already contributed. *Id.*

      Allied World's policy explained:

> The company *shall have the right*, *but not the duty*, to assume charge of the investigation, settlement or defense of *any claim made, suit brought, or proceeding instituted against any insured* upon exhaustion of the applicable underlying limits. If the company has exercised such right, it will not investigate, settle or defend any claim, suit or proceeding after it has exhausted the applicable [limit].

> If the company does not exercise such right, or if the applicable underlying limits are not exhausted, the company *will have the right*, and will be given the opportunity, *to associate effectively* with the insured or any underlying insurer, or both, *in the investigation, settlement or defense of any claim, suit or proceeding that is likely to involve this policy*.

> In such event, the insured, the underlying insurer, and the company shall cooperate in the investigation, settlement or defense of such claim, suit or proceeding.

*Id.* at 32–33 (emphasis added). Allied World's policy further stated it "has no obligation under this policy with respect to any claim, suit or proceeding settled without its prior written consent" (the "no obligation" clause). *Id.* Also regarding consent, Allied World's policy stated that Allied World will only pay for certain defense and supplementary expenses, including "[r]easonable attorney fees and other reasonable investigation, loss-adjustment or litigation expenses incurred directly by the company or by the insured, *with the company's consent.*" *Id.* at 33 (emphasis added).

      Allied World's policy explained that if American Safety's policy "has defined a word or phrase, [Allied World's] policy will follow that definition unless [Allied World's] policy expressly defines such word or phrase, in which case the meaning given to such word or phrase in this policy will apply." *Id.* Notably, Allied World's policy did not define a "suit."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**D.    When An Excess Insurer's Obligations Are Triggered**

Under California law, "[all] primary insurance must be exhausted before liability attaches under a secondary policy…This means that an excess insurer has no duty to defend or contribute to defense costs until primary limits are exhausted in resolution of third-party claims against the insured." *Cnty. of Santa Clara v. U.S. Fid. & Guar. Co*., 868 F. Supp. 274, 277 (N.D. Cal. 1994) (citations omitted).  However, exceptions may arise based on specific policy language.  *SantaFe Braun, Inc. v. Ins. Co. of N. Am*., 52 Cal. App. 5th 19, 29 (2020) ("It is well settled that an excess insurer has no duty to defend unless the underlying primary insurance is exhausted, absent policy language to the contrary.") (citation omitted).

Following the exhaustion of a primary insurance, the excess insurer's duty to defend or indemnify is generally triggered by the commencement of a "suit."  *See Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 869 (1998), *as modified* (Sept. 23, 1998) ("An insurer has a duty to defend when the policy is ambiguous, and the insured would reasonably expect the insurer to defend him or her against the suit…") (citation omitted).  Under a "literal meaning" approach, "suit" refers to "actual court proceedings initiated by the filing of a complaint."  *Id.* (explaining that under this literal approach, there is no "suit" that the insurer must defend absent a filed complaint).  However, a suit may also be an adjudicative administrate proceeding.  *See Ameron Int'l Corp. v. Ins. Co. of Pa*., 50 Cal. 4th 1370, 1374–75 (2010) (finding an administrative adjudicative proceeding before an administrative law judge a "suit" under those circumstances).

Important here, where an insurance policy provides the definition of a "suit," the court applies that definition.  *See Ortega Rock Quarry v. Golden Eagle Ins. Corp*., 141 Cal. App. 4th 969, 979 (Cal. Ct. App. 2006) (applying the definition of a suit based on the insurance policies).

**E.    Allied World's Denial of Coverage**

In late 2016 and 2017, Plaintiff became aware of construction defects involving homes that closed escrow during the American Safety and Allied World policy period.  ECF, Ex. 1, 2.  On March 15, 2017, Plaintiff emailed the defects and homeowners' claims (the "notices") to Allied World.  ECF 27, Ex. 4, 2–3.  The email identified twelve homes as having the "same general harmful conditions" and said there may be a "potential these claims will penetrate into [Allied World's] coverage."  *Id.*  One day later, Allied World acknowledged receipt via letter.  ECF 27, Ex. 5.  Allied World noted in the letter that they established a file based on this information, clarified they were not confirming coverage, and reserved all rights and defenses on the issue.  *Id.*  American Safety agreed to pay its remaining policy limit for amounts allegedly incurred to

4

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

investigate, defend, and resolve the notices, which involved Plaintiff buying back the impacted homes.  ECF 27, Ex.1, 2.  Allied World disputes such payments were for covered amounts.  *Id.*

On October 5, 2017, Plaintiff sent a letter to Allied World asking Allied World to "acknowledge that Allied World will fund reasonable settlements of the property damage claims up to its policy limits once the limits of the American Safety policy are exhausted."  ECF 27, Ex. 16, 2–3.  Plaintiff's letter explains that it requested that "Allied World provide consent to settle the tendered third-party property damage claims arising from [Plaintiff's] development…and confirm that such settlements will not violate…the Allied World policy" and that Allied World "confirm in writing that Allied World will consent to settlement of the claim…and will acknowledge to pay reasonable settlements up to its policy limit for third party claims covered under the Allied World Policy."  *Id.* at 3–4.  Plaintiff also asked Allied World to provide its position on the alleged claims by October 10, 2017, "[i]n light of the upcoming settlement discussions."  *Id.* at 4.

On October 11, 2017, Allied World responded, stating that it was "continuing to investigate coverage for the [] claims, subject to a reservation of rights."  ECF 27, Ex. 17, 2.  Allied World clarified that while its investigation was ongoing, it continued to reserve all rights and defenses under its "no obligation" clause and under the "voluntary payments" clause (as adopted from American Safety's policy).  *Id.* at 2.  Allied World also explained in this letter that it believed it was "unclear that the claims and resulting harm are sufficiently alike that the highly unusual, pre-litigation buy-backs being proposed are an appropriate way (much less the only appropriate way) to handle claims identified for this remedy."  *Id.* at 3.  Therefore, Allied World "continue[d] to reserve all rights under its excess policy and the law," *id.* at 4, and declined to pay costs incurred from the construction matters.  ECF 27, Ex. 1, 3.

### F.    The Right to Repair Act, Cal. Civ. Code §§ 895–945.5

The Right to Repair Act was enacted in 2002 "to specify the rights and requirements of a homeowner to bring an action for construction defects, including applicable standards for home construction, the statute of limitations, the burden of proof, the damages recoverable, a detailed prelitigation procedure, and the obligations of the homeowner."  *Anders v. Superior Court* (2011) 192 Cal. App. 4th 579, 585 (citation omitted).  Chapter 1 of the Right to Repair Act defines terms immaterial here, Chapter 2 outlines building standards, Chapter 3 explains obligations on the builder, and Chapter 4 prescribes nonadversarial prelitigation procedures a homeowner must initiate before bringing a civil action against the builder to seek recovery for the alleged construction defects.  *See* Cal. Civ. Code §§ 895–38.

5

United States District Court
Northern District of California

Under Chapter 4 of the Right to Repair Act, a homeowner must initiate certain prelitigation procedures before "bringing a civil action against the builder for alleged construction defects." *The McCaffrey Grp., Inc. v. Superior Court*, 224 Cal. App. 4th 1330, 1343 (Cal. Ct. App. 2014) (citing Cal. Civ. Code §§ 910–38). For instance, a party must provide written notice of a claim prior to filing an action, and the written notice must (a) be provided to the builder via certified mail, overnight mail, or personal delivery; (2) include the claimant's claim that the construction of his or her residence violates any of the standards set forth in Chapter 2 of the Right to Repair Act; (3) provide the claimant's name, address, preferred method of contact, and shall state that the claimant alleges a violation pursuant to this part against the builder; and (4) "describe the claim in reasonable detail sufficient to determine the nature and location, to the extent known, of the claimed violation." *See* Cal. Civ. Code § 910(a).

When a homeowner complies with the notice requirements just described, their written notice shall then "have the same force and effect as a notice of commencement of a legal proceeding." *Id.* A homeowner can still "seek[] redress through any applicable normal customer service procedure as set forth in any contractual, warranty, or other builder-generated document," but if they do so, that request "shall not satisfy the notice requirements of this section." *Id.* § 910(b). After a homeowner complies with the written notice procedures described in Chapter 4, the builder must timely acknowledge receipt of the notice, decide to inspect and test the claimed defects, and make a written offer to repair the defects if it decides to do so. *Id.* § 917.

The Right to Repair Act allows a builder to opt out of Chapter 4's prelitigation procedures and to create their own instead: "A builder may attempt to commence nonadversarial contractual provisions other than the nonadversarial procedures and remedies set forth in this chapter." *Id.* § 914(a). The statute states: if a builder does so, it "…may not, in addition to its own nonadversarial contractual provisions, require adherence to the nonadversarial procedures and remedies set forth in this chapter, regardless of whether the builder's own alternative nonadversarial contractual provisions are successful in resolving the dispute or ultimately deemed enforceable." *Id.*

A builder's opt out of Chapter 4's procedures "is binding," and the builder "opts out of the entirety of Chapter 4." *Baeza v. Superior Court*, 201 Cal. App. 4th 1214, 1224–26 (Cal. Ct. App. 2011). That builder cannot then enforce Chapter 4's rules. *Anders*, 192 Cal. App. 4th at 589.

It is undisputed in this case that Plaintiff opted out of Chapter 4 of the Right to Repair Act. *See* ECF 27, Ex. 11, 31 ("Declarant's Election to Opt Out of [the Right to Repair Act's] Non-

Adversarial Procedures"); ECF 27, Ex. 13 (stating Plaintiff elected to opt out of the procedures); ECF 28 (discussing Plaintiff's "opt out of the Right to Repair Act's pre-litigation procedures").

### G.    Evidentiary Objections

Allied World submitted various evidentiary objections to Plaintiff's evidence.  ECF 38 at 10-12.  At the May 6, 2025, hearing, the Court overruled all objections except Defendant's expert testimony objection, which it took under submission.  ECF 51.  The Court finds that it need not address Defendant's expert testimony objection because this Order does not rely on the challenged evidence, as explained below.  *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (holding a court need only rule on evidentiary objections that are material to its ruling) (citation omitted).

## II.    LEGAL STANDARD

### A.    Rule 56(a)

A party may move for summary judgment, or partial summary judgment, identifying claims, or parts of claims, for which summary judgment is sought.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court finds there is no genuine dispute of material fact, then it may grant the motion, finding that the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322.  A material fact is one that could affect the outcome of the litigation under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The moving party bears the burden of showing an absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  They may satisfy the burden by showing: (1) evidence negating an essential element of the nonmovant's case, or (2) that the nonmovant failed to make a sufficient showing to establish an essential element of their case for which the party will bear the burden of proof at trial.  *Id.* at 322–23.  Where the moving party does not bear the burden of proof at trial, they may show that the nonmovant failed to provide evidence to support their case.  *Id.* at 325. The moving party is not required to produce evidence showing an absence of a genuine dispute of material fact, nor to offer evidence negating the nonmovant's claim.  *Lujan v.  Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  "[T]he motion may, and should, be granted so long as whatever is before the [D]istrict [C]ourt demonstrates that the standard for entry of judgment, as set forth in Rule 56(c), is satisfied."  *Id.* (quoting *Celotex*, 477 U.S. at 323).

United States District Court
Northern District of California

"If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating 'that there is some metaphysical doubt as to the material facts.'"  *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 940–41 (S.D. Cal. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.  574, 586 (1986)).

To defeat summary judgment, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit…will properly preclude the entry of summary judgment…Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

At summary judgment, a court may not make credibility determinations.  *Krueger*, 396 F. Supp. 3d at 941.  The evidence, and inferences drawn therefrom, must be construed in the light most favorable to the non-moving party.  *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir.  2008) (citation omitted).

### B.    California Insurance Contract Law

Under California law, the interpretation of an insurance contract is a question of law. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  Therefore, it is "often amenable to summary judgment, although summary judgment may be inappropriate in a contract case if there is a dispute over a material fact necessary to interpret the contract."  *Liberty Surplus Ins. Corp. v. Samuels*, 562 F. Supp. 3d 431, 437 (N.D. Cal. 2021) (internal citations omitted) (cleaned up).

Standard contract interpretation principles apply to breach of insurance policies disputes. *Powerine Oil Co., Inc. v. Super. Ct.*, 37 Cal. 4th 377, 390 (2005).  "Under California law, [t]he fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties."  *Liberty Surplus*, 562 F. Supp. 3d at 438 (internal quotations and citation omitted).  "Such intent is to be inferred, if possible, solely from the written provisions of the contract."  *Id.* (citation omitted) "The clear and explicit meaning of these provisions [are] interpreted in their ordinary and popular sense, unless [the provisions are] used by the parties in a technical sense or a special meaning is given to them by usage controls judicial interpretation."  *Id.* (internal quotations and citation omitted).

### 1.    Implied Waiver of Consent: The *Diamond Heights* Rule

In *Diamond Heights*, a California appellate court assessed whether the plain meaning of an

United States District Court
Northern District of California

excess layer insurance provider's "no action" clause — which provided that the insured could only "make a claim of loss after its liability had been rendered certain by a final judgment after a trial" or "by written agreement" of all parties, including the insurer — meant what it said it meant. 227 Cal. App. 3d 563, 574 (Ct. App. 1991). In other words, did the clearly stated no action clause mean the insurer had absolute veto power if it did not agree? The court held that the clause did not give such power, and the *Diamond Heights* rule was born: "an excess insurer may waive its rights under [a no action] clause if it rejects a reasonable settlement and at the same time fails to offer to undertake the defense." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 851 F.3d 976, 983 (9th Cir. 2017) ("*Teleflex*") (citing *Diamond Heights*, 227 Cal. App. 3d at 581).

Stated differently, the *Diamond Heights* rule provides: "an excess liability insurer has three options when presented with a proposed settlement of a covered claim that has met the approval of the insured and the primary insurer. The excess insurer must (1) approve the proposed settlement, (2) reject it and take over the defense, or (3) reject it, decline to take over the defense, and face a potential lawsuit by the insured seeking contribution toward the settlement…Under *Diamond Heights*, the insured is entitled to reimbursement if the excess insurer was given a reasonable opportunity to evaluate the proposed settlement, and the settlement was reasonable and not the product of collusion." *Id.* at 979 (cleaned up) (internal quotation marks and citation omitted).

In *Teleflex*, the Ninth Circuit assessed whether the district court appropriately applied the *Diamond Heights* rule by first describing in detail the facts of *Diamond Heights*:

> In *Diamond Heights,* a condominium developer sued its excess insurer, Central, seeking contribution toward the settlement of construction defects claims covered by the excess insurance policy. The developer and its primary insurer notified Central that the plaintiffs' settlement demand exceeded the primary coverage layer and that it was likely the primary policy limits would be exhausted.
>
> The excess insurer sent a reservation of rights letter and stayed out of the defense…The developer then sued Central, seeking contribution toward the settlement. Central moved for summary judgment on the ground that the settlement was entered without its consent and therefore violated the policy's "no action" clause. The trial court granted summary judgment in Central's favor, but the court of appeal reversed.
>
> The appellate court ruled that, subject to certain conditions, a *primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess coverage*, and ... *enter into such settlement binding upon the excess insurer without the excess insurer's consent, notwithstanding the 'no action' clause*…the excess insurer may waive its rights under that clause if it rejects a reasonable settlement and at the same time fails to offer to undertake

United States District Court
Northern District of California

the defense.

*Id.* at 982 (citations omitted) (emphasis added).

The Ninth Circuit found the district court correctly followed the *Diamond Heights* rule in its diversity action governed by California law where the insured sued its excess insurance carrier in connection with the excess carrier's refusal to contribute to the settlement arrived at by the insured and the primary insurer or to take over the defense.  *Id.* at 987.

As *Telefax* opines, a rule that an excess insurer does not have an absolute right to veto a reasonable settlement makes sense because "[a] contrary rule would imperil the public and judicial interests in fair and reasonable settlement of lawsuits…[and] have inequitable consequences for the insured in cases where liability may exceed excess limits, as well for primary insurers in cases where liability does not."  *Id.* at 983; *see also Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 987–90 (2006), *as modified on denial of reh'g* (Feb. 17, 2006) (explaining that a contrary rule would "would impose an unnecessary burden on primary insurers and parties to an underlying action to hold that an excess insurer has an absolute right to withhold its consent to a settlement, while at the same time decline to participate in the action" and that "policies [cannot] be read to permit an excess insurer to hover in the background of critical settlement negotiations and thereafter resist all responsibility on the basis of lack of consent").

## III.    DISCUSSION

Plaintiff first seeks partial summary judgment that a "suit" commenced based on the notices from the homeowners.  ECF 27.  Plaintiff argues that the Court must find that a suit commenced because the notices were "suits" under Chapter 4 of the Right to Repair Act.  *Id.*

Allied World argues that a suit did not commence because (1) Chapter 4 of the Right to Repair Act does not apply here since Plaintiff opted out of that chapter, and (2) Allied World must have consented prior to any of Plaintiff's prelitigation procedures constituting a "suit."  ECF 38.

There remain genuine issues of material fact as to whether a "suit' commenced.

### A.    A "Suit" Did Not Commence Based on Chapter 4 of the Right to Repair Act.

Plaintiff argues a "suit" commenced here because the homeowners' notices were consistent with the notices described under Chapter 4 of the Right to Repair Act, which constitute a suit based on the statute's plain language.  *See* Cal. Civ. Code §§ 910(a) (explaining that when the Chapter 4's notice requirements are followed, such notice "shall have the same force and effect as a notice of commencement of a legal proceeding").  Defendant argues there remain disputed issues of material act regarding whether the notices satisfied Chapter 4's requirements, but claims the

10

answer is of no consequence where Plaintiff opted out of Chapter 4.  The Court agrees.

The Court finds genuine disputes of material fact preclude summary judgment as to whether the homeowners' notices qualify as notices under Chapter 4.  *See Anderson*, 477 U.S. at 248 (making clear that disputes over facts that might affect the outcome of the suit properly preclude the entry of summary judgment).  First, Plaintiff provides no evidence to support its position that all the notices here met the requirements of Chapter 4.  *See Celotex*, 477 U.S. at 323 (stating that the moving party bears the burden of showing an absence of a genuine dispute of material).  To the contrary, Plaintiff provides the Court with a homeowner agreement laying out the notices' requirements, which are clearly different from Chapter 4's notice requirements. *Compare* ECF 27, Ex.11, 11–12 (requiring homeowners provide "written notice" of a repair issue and serve it on declarant's agent in an unspecified manner), *with* Cal. Civ. Code § 910(a) (requiring claimants provide "written notice *via certified mail, overnight mail, or personal delivery*").  Therefore, the Court cannot find that Plaintiff's notices were Chapter 4 notices.

Even if the Court could find that the notices satisfied Chapter 4's notice requirements, such a finding would not mean Plaintiff's notices were "suits" because Plaintiff "opted out" of Chapter 4's definition of a suit.  *See* ECF 27, Ex. 11 at 31 ("Declarant's Election to Opt Out of [the Right to Repair Act's] Non-Adversarial Procedures"); *see also Baeza*, 201 Cal. App. 4th at 1225 (making clear that when a builder opts out of Chapter 4, the builder "opts out of the entirety of Chapter 4").  Moreover, Plaintiff's indisputable opt out is not undone by simply including in its contract with the *homeowners* that "a properly completed and served notice of claim shall have the same force and effect as a notice of the commencement of a legal proceeding as defined in California Civil Code Section 910(a)," ECF 27, Ex. 11 at 34, because a contract between the homeowners and Plaintiff does not bind *Allied World*.  *See Mewawalla v. Middleman*, 601 F. Supp. 3d 574, 589 (N.D. Cal. 2022) (discussing general rule that contracts do not bind nonparties).

The Court disagrees with Plaintiff that *D.R. Horton* establishes that a finding of the notices satisfying Chapter 4's requirements equate to a finding that the notices are suits.  *D.R. Horton* discussed whether a notice sent *pursuant to the requirements of Chapter 4* of the Right to Repair Act constituted a legal proceeding and, unremarkably, found in the affirmative based on the plain language of Chapter 4.  *D.R. Horton Los Angeles Holding Co. v. Am. Safety Indem.* Co., No. 10CV443 WQH WMC, 2012 WL 33070, at *19 (S.D. Cal. Jan. 5, 2012).  *D.R. Horton* therefore merely serves as background to understanding the effect of Chapter 4's definition of a legal proceeding as applied to notices sent *pursuant to Chapter 4.*

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*D.R. Horton*'s finding concerning the definition of a "suit" is also not dispositive. *D.R. Horton* is factually distinguishable because there was no evidence in that case that the plaintiff opted out of Chapter 4. *See generally id.* *D.R. Horton* did not consider the definition of a "suit" because the Court applied Chapter 4's definition of a "legal proceeding" given the lack of an opt-out provision. *Id.* at 19 (explaining that Chapter 4's provision meant that the notices to builder in that case "shall have the same force and effect as a notice of commencement of a legal proceeding"). In this case, however, Chapter 4's definition of a "legal proceeding" does not apply because Plaintiff opted out of Chapter 4. *Baeza*, 201 Cal. App. 4th 1214 at 1225; *see also* ECF 27, Ex. 13 (stating Plaintiff's opt out of the Right to Repair Act procedures); and ECF 28 (discussing the same).

The argument that coverage should flow from Chapter 4 of the Right to Repair Act because Chapter 4's procedures are mandatory also fails since Plaintiff cannot reasonably expect coverage under a provision it opted out of. *See id.*; *cf. Wexler v. California Fair Plan Ass'n*, 63 Cal. App. 5th 55, 61 (2021), *as modified on denial of reh'g* (Apr. 19, 2021), *as modified* (Apr. 26, 2021) (explaining the rule that clear contractual language governs "protects not subjective beliefs but objectively reasonable expectations").

Finally, Plaintiff's reliance on *Clarendon* falls short. *Clarendon* decided, as a matter of first impression, whether the alternative dispute resolution process that the plaintiff there had to undertake *pursuant to the relevant statute* (the now-repealed Calderon Act) triggered a "suit" that the insurer had a duty to defend. *Clarendon Am. Ins. Co. v. Starnet Ins. Co.*, 113 Cal. Rptr. 3d 585 (Ct. App.), *review granted and opinion superseded*, 242 P.3d 67 (Cal. 2010). The court found that the *statutorily mandated procedures* were "suits" because, among other reasons, they were "more than a prelitigation alternative dispute resolution requirement" and were "an integral part of the litigation process precisely because of the application and legal effect described in the Calderon Act." *Id.* at 592–593. All *Clarendon* tends to support is the statutory language that already exists in Chapter 4: when the notice requirements of Chapter 4 are followed, *such notices* "have the same force and effect as a notice of commencement of a legal proceeding." Cal. Civ. Code §§ 910(a). But again, such an obvious conclusion has no impact here where Plaintiff opted out of such requirements. Therefore, Chapter 4's explicit statement that notices following its requirements are legal proceedings does not mean the notices at issue here were legal proceedings.

**B.    A "Suit" Did Not Commence from Plaintiff's Prelitigation Procedures.**

Plaintiff argues that Allied World need not consent to Plaintiff's prelitigation procedures,

12

including the notices, mediations, and settlements, for those procedures to constitute a suit.  ECF 39.  Allied World disagrees, arguing that Plaintiff's prelitigation procedures could not constitute a suit without Allied World's consent based on the plain language of the policies.  ECF 37 at 14–15.

Because genuine disputes of material fact preclude summary judgment as to whether the homeowners' notices qualify as notices under Chapter 4, the Court considers the policies' definition of a "suit" to determine whether Plaintiff needed Allied World's consent.  *See Ortega Rock Quarry*, 141 Cal. App. 4th at 979 (applying insurance policy's definition of "suit").

The Court focuses on Allied World's policy to determine whether Allied World defines a "suit" – it does not.  Then, the Court looks to American Safety's policy because Allied World tells it to: "[if American Safety's policy has] defined a word…this policy will follow that definition unless this policy expressly defines such word…in which case the meaning given to such word…in this policy will apply."  ECF 27, Ex. 3, 31.  American Safety's policy says a "suit" includes:

> (1) An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
>
> (2) Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

*Id.*  This definition invites the question: do Plaintiff's prelitigation procedures fit within either category?  The parties agree that Plaintiff engaged in mediation with the homeowners and that mediation is an "other alternative dispute resolution proceeding" described in the second definition of a "suit" above.  *See* ECF 27 at 14 (explaining that Plaintiff conducted mediation with the homeowners to resolve the claims); *see also* ECF 37 at 14 (agreeing mediation is an alternative dispute resolution procedure).  However, the parties disagree as to whether Allied World's consent was required for those mediation procedures to constitute a "suit" per the above definition.  *Id.*

The Court first finds that the policies' plain language of the definition of a "suit" indicates that Allied World's consent would be required for mediation to be a "suit." By way of reminder, Allied World is an excess insurer that provided Plaintiff a following form excess policy.  ECF 27, Ex. 3, 31 (Allied World's policy "follow[s] the warranties, terms, and conditions, exclusions, and limitations" in American Safety's policy).  "A following form excess policy has the same terms and conditions as the underlying primary policy."  *Vizio, Inc. v. Arch Ins. Co.*, No. 22-55755, 2023 WL 7123784, at *2 (9th Cir. Oct. 30, 2023) (citation omitted).  In *Vizio*, the Ninth Circuit

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

addressed whether a primary insurer's consent provision meant that the excess insurer's consent was required before the plaintiff could settle claims in litigation. *Id.* There, the excess insurer's policy included a provision stating that the excess insurer's policy shall "follow form to, and apply in conformance with," the provisions of the primary insurer's policy. *Id.* Thus, the court held, the primary insurer's consent provision was "incorporated" into the excess insurer's policy and the plaintiff was required to seek the consent of the *excess insurer* prior to settling the litigation. *Id.*

Since Allied World is a following form policy that explicitly incorporates the terms of American Safety's policy, ECF 27, Ex. 3, 31, the plain language of the policies indicates that Plaintiff was required to obtain Allied World's consent before the alternative dispute resolution proceedings in which it engaged constituted a "suit," *see Vizio, Inc.*, 2023 WL 7123784, at *2 (finding primary policy's consent provision meant the plaintiff needed the consent of the primary *and* excess insurer). It is undisputed that Allied World did not consent to Plaintiff's prelitigation procedures, including the mediations and settlements of the notices. *See* ECF, Ex. 17. Thus, the plain language of the policies would indicate that such procedures were not "suits." [1]

However, the analysis doesn't end there — there remains a genuine dispute as to issues of material fact regarding whether Allied World may have waived its right to consent under the *Diamond Heights* rule. As explained in *Diamond Heights*, Allied World "ha[d] three options when [it was] presented with a proposed settlement of a covered claim that [] met the approval of the insured and the primary insurer. The excess insurer must (1) approve the proposed settlement, (2) reject it and take over the defense, or (3) reject it, decline to take over the defense, and face a potential lawsuit by the insured seeking contribution toward the settlement." *Teleflex*, 851 F.3d at 979 (citation omitted). Allied World "may also challenge the settlement on the ground of unreasonableness or that it is a product of collusion between primary insurer and insured." *Id.* The rule is not unfair to Allied World considering Allied World can still "avoid[] a proposed settlement or challeng[e] a final settlement" because it "may…agree to undertake the defense …and either conduct its own settlement negotiations or take the action to trial." *Id.* at 983.

Like *Diamond Heights*, a genuine dispute of material fact remains in this case related to

---

[1] The Court is also unconvinced by Plaintiff's citation to *Food Pro Internat., Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 990 (2008) for the first time in its PowerPoint presented at the May 6, 2025, hearing. Plaintiff claimed in its presentation that *Food Pro Internat., Inc.* stands for the proposition that an insurer forfeits coverage defenses based on consent or notice where it refuses to defend. However, *Food Pro Internat., Inc.* nowhere discusses consent provisions or whether a "suit" commenced. *See generally id.* at 984–993 (discussing general duty to defend principles and general requirement to construe the at-issue policy's professional services exclusion narrowly).

whether Plaintiff met its prima facie burden to show (1) Allied World "was afforded a reasonable opportunity to undertake the defense prior to the settlement"; (2) after being given that reasonable opportunity, Allied World wrongfully failed or refused to provide coverage or a defense, and (3) Plaintiff "thereafter entered into a settlement of the litigation which was (4) reasonable in the sense that it reflected an informed and good faith effort by [Plaintiff] to resolve the claim." *Id.* at 987 (citing *Pruyn v. Agric. Ins. Co.*, 36 Cal. App. 4th 500, 528 (1995)); *see also Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 679 (2000) ("Whether there has been a waiver is usually regarded as a question of fact to be determined by the jury…") (citation omitted). Indeed, the evidence demonstrates that Allied World was concerned about the reasonableness of the settlements: "[Allied World] believed it w[a]s unclear that the claims and resulting harm are sufficiently alike that the highly unusual, pre-litigation buy-backs being proposed are an appropriate way (much less the only appropriate way) to handle claims identified for this 'remedy.'"  ECF 27, Ex. 17, 3.  Therefore, this issue is not currently settled by undisputed facts.

   If, at trial, the evidence later establishes a prima facie showing of the *Diamond Heights* elements, "the burden of proof will shift to [Allied World] to persuade the trier of fact, by a preponderance of the evidence," that it was not provided with a reasonable opportunity to evaluate the settlement and decide whether to under the defense, that Plaintiff's settlement did not represent a reasonable resolution of Plaintiff's claim, or that the settlement was the product of fraud or collusion.  *Teleflex*, 851 F.3d at 987 (citing *Pruyn*, 36 Cal. 4th at 530); *see AXIS Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 849 (9th Cir. 2020) (holding that "excess insurers generally may not second-guess the payment decisions of underlying insurers" and that "the burden is on the excess insurer to show that the underlying insurers' payments were motivated by fraud or bad faith, or that it has a clear contractual right to challenge those payments").

   On summary judgment, however, Plaintiff fails to meet its burden to demonstrate that the undisputed facts show that Allied World waived its right to consent to an alternative dispute proceeding.  *Celotex*, 477 U.S.  at 323 (discussing moving party's burden).  Thus, the Court denies Plaintiff's motion for partial summary judgment as to whether Plaintiff's procedures were a "suit."

   **C.    Plaintiff Failed to Demonstrate that Allied World Breached a Contract.**

   Having found there remain issues of material fact as to whether a "suit" occurred that triggered Allied World's duty to defend, the Court need not reach the question of whether Allied World then breached those obligations.  *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th, 1, 36 (1995) ("[I]f there is no potential for coverage, and hence, no duty to defend under the terms of the

policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."). As such, the Court denies Plaintiff's partial summary judgment motion as to breach.

The Court notes that even if it found a "suit" under the policies triggered Allied World's obligations—which it cannot at this stage—the *Diamond Heights* rule would still govern whether Allied World waived its right to consent under its no voluntary payments and no obligation clauses and thus breached its contract with Plaintiff. *See Teleflex*, 851 F.3d at 982 (applying *Diamond Heights* to assess whether excess insurer had absolute settlement veto rights under consent clauses); *see also LMA N. Am., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 924 F. Supp. 2d 1188, 1204–05 (S.D. Cal. 2013) (denying summary judgment motion where genuine issues of material fact remained over whether consent provisions applied per *Diamond Heights*).

## IV.    CONCLUSION

The Court **DENIES** Plaintiff's motion for partial summary judgment as to whether a "suit" commenced because there remain issues of material fact as to whether Allied World waived its right to consent to Plaintiff's alternative dispute resolution proceedings before such proceedings constituted a "suit" under the policies and under the *Diamond Heights* rule as outlined in *Teleflex*.

The Court **DENIES** Plaintiff's motion for partial summary judgment regarding whether Allied World breached its contract in denying coverage to Plaintiff because there remain disputed issues of material fact as to whether Allied World's obligations were ever triggered by a "suit."

All claims and future dates therefore remain.

The next court date is October 30, 2025, at 2:00 PM for further case management conference via videoconference only. The joint case management statement is due no later than October 23, 2025.

**IT IS SO ORDERED.**

Dated: June 20, 2025

TRINA L. THOMPSON
United States District Judge